### KINGSLAND and Wife *v.* RAPELYE and Wife. (*a*).

Although the intention of a testator is the governing principle with the court when looking at his will, yet the court is bound by precedents and authority, and will not proceed on arbitrary conjecture in settling its construction.

The words "*lawful issue*" have as extensive a signification as "heirs of the body," and embrace lineal descendants of every generation. And when used in a devise, by which the immediate devisee takes an unrestricted freehold, it is a word of limitation and has the same effect as *heirs of the body.*

A testator bequeathed to his daughter (who was unmarried at the time of his death) during her life, the rents, issues and profits of one equal fourth part of all the residue and remainder of his estate, real and personal, to be paid on her own receipt and free from any husband's control; and, on her death, he gave and devised such fourth part unto the "lawful issue of his said daughter, his, her and their heirs, executors, administrators and assigns for ever, equally to be divided among them share and share alike :" *Held,* (under the law prior to the Revised Statutes,) that the daughter took an estate tail, which the statute converted into a fee simple.

(*a*) This case is recognized by chancellor Kent in the 4th vol. of his Commentaries, p. 231, note b, 3d edit.

*October* 28.
1833.

KINGSLAND
*v.*
RAPELYE.

*Will.*
" *Lawful*
*issue.*"
*Devise.*

ANDREW TEN EYCK died on the fifteenth day of October, eighteen hundred and twenty-eight, seised of a considerable real estate in the city of New York. By his will, dated the ninth day of June, eighteen hundred and twenty-six, he gave, in the first place, some pecuniary legacies and made a provision for his wife for life, in lieu of dower; and then devised as follows: "I do give and bequeath unto my daughter, Deborah Ten Eyck, during the term of her natural life, the rents, issues and profits of one equal fourth part of all the residue and remainder of my estate, both real and personal, to be paid to her upon her own receipt, free from the control, debts and engagements of any husband she may have; and, upon the decease of my said daughter Deborah, I do give, devise and bequeath the said one equal fourth part of all the said residue and remainder of my estate, both real and personal, unto the *lawful issue* of my said daughter Deborah, his, her and their heirs, executors, administrators and assigns for ever, equally to be divided among them share and share alike." The next clause of the will bequeathed another fourth part, in the same manner, to his daughter Frances Kingsland for life; and, at her death, to her lawful issue, using the same words as in the preceding clause.

By the next clause, the testator gave and devised absolutely another one equal fourth part of all the residue and remainder of his estate, both real and personal, unto his son Andrew Ten Eyck, Junior, his heirs, executors, administrators and assigns for ever. In regard to this fourth part no question arose.

The will then proceeded: "Item, I do give and bequeath unto my son, James Ten Eyck, during the term of his natural life, the rents, issues and profits of the remaining one equal fourth part of all the said residue and remainder of my estate, both real and personal; and, upon the decease of my said son James, I do give, devise and bequeath the said one equal fourth part of all the said residue and remainder of my estate, both real and personal, unto the lawful issue of my said son James, his, her and their heirs, executors, administrators and assigns for ever, equally to be divided among them share and share alike." On the thirteenth day of October, one thousand eight hundred and twenty-eight, two days before his

death, the testator duly executed and published a codicil to his will, in which, after giving an annuity of seventy dollars, as being the interest of one thousand dollars, to his daughter Mary Smiley for life, and directing, at her death, the sum of one thousand dollars to be divided as a legacy between her lawful issue and their legal representatives share and share alike, and after giving a legacy of fifty cents to his daughter Elizabeth, it was declared, that, since the making of the will, the testator's son James had departed this life; therefore, by the codicil, he said, " I do revoke the bequest and devise in and by my will given to him, and I do hereby give, devise and bequeath unto each of my grandchildren, Richard Ten Eyck and Philip Ten Eyck, the children of my deceased son James, the sum of one thousand dollars, to be paid to them respectively by my executors out of my estate." He then directed, that the interest of the one thousand dollars given to each, should be applied to their education and support until they had respectively attained the age of twenty-one years; and, in case both or either of them should die before attaining that age, without leaving lawful issue, then he ordered and directed that the part and portion of his estate by that his codicil given to him so dying should revert to the estate and be equally divided among the testator's surviving children and their heirs; excepting, nevertheless, his daughter Elizabeth, who was excluded.

Since the death of the testator, Deborah, one of the devisees, had intermarried with Charles Rapelye. She had no issue. Frances Kingsland had issue several children, some of whom were born before the will was made. The widow of the testator had departed this life since his death, so that her dower and the provision made for her by the will had ceased.

The bill in this cause was filed by Frances Kingsland and her husband against all the other children and grandchildren of the testator *in esse*, for the purpose of settling the construction of the will and codicil, and of ascertaining what estates and interests the parties respectively were entitled to under the same, with a view to a partition of the real estate and a sale, if necessary; and for an account of the personal estate and of the rents and profits of the real estate, which might have come to the hands of the executors, and who for this purpose, were also made defendants.

1834.

KINGSLAND
v.
RAPELYE.

Mr. *R. Bogardus* and Mr. *Peter A. Jay*, for the complainants.

Mr. *Gerard*, for the defendants.

*Feb.* 8.
1834.

THE VICE-CHANCELLOR :—The first question is, upon the devises to Deborah and Frances (being precisely alike in form) whether they take life-estates only or, under the limitations over, estates in fee or estates in tail which the statute converts into fee ?

This question and, indeed, all questions arising upon this will, are to be determined by the rules of law as they existed anterior to the late revision of the statutes.

The complainants claim, by their bill, only a life-estate in Frances, in the one fourth devised to her ; and admit that their children are entitled to the fee in remainder. But Deborah, having no children and it being altogether uncertain whether she will ever have any to take by way of remainder at her death, is not satisfied with a construction which shall give to her only a freehold for life ; and she and her husband, therefore, insist upon an estate in fee or in fee-tail, in their one fourth.

This is an important question, as regards her ; and I have been induced to examine it with the more care and solicitude, because the same construction which shall be put upon these two clauses of the will, will apply to the subsequent clause, by which another fourth part of the estate was intended to be devised to the son James, who happened to die before the testator ; and if it be found that an estate in fee would have passed to him, there will be no difficulty in determining the extent of the revocation by the codicil, (which is also an important question in this cause) and whether the infant children of James are entitled to any thing more than the legacies, under the latter instrument ?

There are words used by the testator, in each of the clauses of the will, in favor of his daughters Deborah and Frances, (and of his son James,) sufficient for all the purposes of creating an estate in fee simple or fee tail, at common law, in such devisees respectively or in their children, as immediate devisees in remainder, under the denomination of "lawful

1834.

KINGSLAND
v.
RAPELYE.

issue." Of these alternatives there can be no doubt. But whether the first devisees take any such estate or whether the fee is limited over to their children born or to be born, depends upon the manner of considering the words " lawful issue" as used in the will. If these are words of limitation and an estate in fee vests in the first takers, Deborah and Frances (for I now lay out of view the clause relating to the son James) either by force of the gift or by the statutable conversion of estates tail into fee simple estates, or if those words cannot have that construction, but must be deemed words of purchase, then the daughters are entitled to life estates only.

In order to determine this point, as a matter of construction, resort must be had to the intention of the testator, to be collected from the whole will; and the words in question must be construed with reference to other words, by which their meaning may be controlled and determined; and when the intention is once ascertained, effect must be given to it, unless some positive rule of law, fixing the meaning of such words, will thereby be violated.

If, indeed, it falls within the rule in Shelly's case, so called, as contended for on the part of the daughter Deborah, which is a rule not depending upon the intention of the testator, but upon the meaning which the law itself has affixed to certain words, when found in a deed or will, and, therefore, becomes a rule of law and not one of construction, then it is no longer open to the inquiry, what the grantor or devisor intended by the use of such words? Thus, as in Shelly's case, if the limitation over, after an estate of freehold or for life expressly given, be to the heirs or the heirs of the body of the same person, these words are to be deemed words of limitation, and the ancestor takes the whole estate comprised within them; if it be to the " heirs of the body," a fee tail; if to " his heirs," a fee simple.

Whenever these words alone are used, there is no question of construction arising from any supposed intention of the party to use them in any other sense than what the law has affixed to them; nor is a different meaning to be sought for. The law, at once, interposes and gives to the words a precise meaning; and, upon this basis, a rule has been established, which, for ages, has been a rule of property wherever the

common law is suffered to prevail, and no instance can be adduced of a deviation from it.

If, however, instead of employing the precise words in a limitation, upon which the rule in Shelly's case was founded, other words, of similar import, are introduced, which may admit of the same and likewise of a different application : as, for example, " issue," " children," " sons," instead of " heirs" or " heirs of the body" or, if there be superadded words of limitation to those just mentioned, or of modification, or expressions tending to create an estate tail by implication merely, in all these cases it then becomes a question of construction upon the context of the instrument and the intention is to be ascertained and followed as the governing principle. This intention has sometimes been called the law of the instrument ; sometimes, the pole-star ; but, in taking it for a guide, courts submit to be bound by precedents and authorities in point and endeavor to follow it upon judicial grounds, and not by mere arbitrary conjecture : 2 Jarman's ed. Powell on Devises, 431, 434.

The present case, so far as Deborah is concerned, is attempted to be supported within the rule in Shelly's case, by considering the words " lawful issue," as synonymous with " heirs of the body." This is correct. *Issue* is a word as extensive in its import as the phrase " heirs of the body." It embraces lineal descendants of every generation ; and is not satisfied by applying it to those at any given period, since it equally applies to all objects of that description at every period. It is *nomen collectivum ;* and when used in a devise, by which the ancestor takes a freehold without any words to modify or restrict its meaning and application, it is a word of limitation and of the same effect with " heirs of the body." This position is abundantly supported by authority. In *King* v. *Melling*, 1 Vent. 225, where the devise was to a son for life ; and, after his decease, to the issue of his body by a second wife, and for the want of such issue, over ; the question was, whether the son took an estate for life or in tail ? Two of the judges of the K. B. decided he took an estate for life, against the opinion of Ch. J. Hale, who, upon mature consideration, held that an estate tail was created. Hale observes, " *it* must be admitted, that, if the devise were to the son and

the issue of his body, he having no issue at the time, it would be an estate tail; for the law will carry over the word issue not only to his immediate issue, but to all that shall descend from him. It would be otherwise, if there were issue at the time;" because, as I apprehend, in that case, the issue (meaning children) would take jointly with their parent as purchasers.

Again he says, " if a devise be made to a man; and, after his death, to his issue (or children) having issue at that time, they take by way of remainder." This can be only by reading the word " issue," as a word of purchase synonymous with *children*, which he evidently does. He, then, proceeds to give the reasons for his opinion in the case itself and to answer the objections against his conclusion, one of which was, that the limitation to the son was expressly for life; upon which he observes, that " though these words do weigh the intention that way, yet they are balanced by an apparent intention that weighs as much on the other side; which is, that as long as the son should have children, the land shall never go over, for there was as much reason to provide for the issue of the issue, as the first issue." Again he observes, " a tenant in tail has, for many purposes, but an estate for life; and it was possible the testator did intend him but an estate for life; but it is by consequence and operation of law only that it becomes an estate tail." Judgment was nevertheless rendered by two judges against one, upon the ground that the son had only an estate for life, which was afterwards reversed in the Exchequer Chamber upon the point of law, where all agreed with Hale, that the son took an estate tail: 2 Levinz, 58, 61.

In *Shaw* v. *Weigh*, 2 Stra. 798, but better reported in Fitzgibbon, 7, and *S. C.* 3 Bro. P. C. (Tom. ed.) 120, under the name of *Sparrow* v. *Shaw*, where a judgment of reversal in B. R. was itself reversed, the same doctrine will be found and the principle established. *Roe* v. *Grew*, 2 Wils. 322, and *S. C.* Wilmot's Opinions 272, is likewise a strong authority upon the point. There, was a devise to George Grew for life; and from and after his decease, to the issue male of his body, &c. and, for the want of such issue male, then over; and the question was, whether George Grew took an estate tail or for life only? The judges were unanimous, that it was

an estate tail. It was admitted, that the word *issue* in a will is a word either of purchase or limitation, as would best effectuate the intention of the testator; and, although it was clearly the testator's intention, that George Grew should have an estate for life only, yet it was also as clear that he intended his sons should take in succession, under the limitation to the issue male of his body; and as both intentions could not be effected, since, if George Grew took only for life, his sons could not take in succession through their father, but would be entitled, if at all, in remainder as devisees or purchasers, therefore, in balancing the two intentions, the weightiest appeared to be, that they should take in succession, and, so, to enable them to take, it was necessary to adjudge him to be tenant in tail. It is to be observed in this case, that it was considered as making no difference, that George Grew had no child at the time of making the will; and, that he had died after the testator, without leaving issue male.

The present case cannot be distinguished from those cited, so far as the limitation is to *lawful issue*, except in one particular. In all those cases, the first gift was expressly for life, as in this instance; and upon the decease or after the death of such tenant, as here, the limitation was to the issue of the body, or to the issue generally, or specially, as in the last case to issue male of the body. Here, it is to the lawful issue, which can mean nothing more than the issue generally of the body of the daughters lawfully begotten. The only difference, then, to which I allude, is in this, that, in the present case, there is no limitation over in default of such issue. This circumstance has been supposed sufficient to distinguish it, in principle; but I am at a loss to perceive on what ground. After an examination of all the cases, several of which are contradictory to those I have above noticed and are overruled either by them or by later decisions, (among which I may particularize *Backhouse* v. *Wells*, and *Loddington* v. *Kime*,) I am induced to adopt the conclusion of an elaborate and critical writer on this subject, that a devise to A. for life, and, after his death, to his issue, with or without a limitation over, becomes, by the operation of the rule in Shelly's case, an estate tail in A.: 2 Jarman's Powell on Devises, 514, 521.

The present case falls within the rule, unless indeed the

superadded words in the limitation require, that "lawful issue" should be construed as words of purchase.

The limitation is "unto the lawful issue of my said daughter, his, her and their heirs, equally to be divided among them, share and share alike." The word *heirs*, though a word of limitation, is of itself unconnected with other words narrowing it down to particular heirs, such as heirs of the body, more comprehensive than issue, since it embraces collateral kindred and is not confined to lineal descendants. In this view, the word "heirs," in a limitation thus framed, may operate to confer the estate upon some other than a lineal descendant, in a manner inconsistent with the devolution of an estate tail; but, by giving to it the narrower construction, and limiting its meaning to heirs of the body or issue, all difficulty from the use of this word in the devise in question is at once obviated; for the rule is, that additional words of limitation, of the same import or rather not at variance with the former words, which give an estate tail, shall not operate to convert such words of designation and change the course of descent of the estate. And there are numerous authorities to show, that the word heirs, in a superadded clause of limitation, as in this case, being a word of limitation and of similar import, cannot have the effect of changing former words and diverting their meaning from the object of an estate tail: 1 Prest. on Est. 347, 349, 353, 368.

But, there are still further words of modification or explanation to be noticed. It is declared, that the issue of the daughter shall take distributively, as tenants in common; and it is contended that these describe particular persons, as individuals, to take in their own right and not under a tenancy in tail. A complete answer to the argument, on this part of the case, seems to be, that there may be a tenancy in common in tail; and, therefore, giving to the words "equally to be divided among them, share and share alike," their full effect, still there appears to be nothing incompatible with the nature of such an estate.

In *Mogg* v. *Mogg*, 1 Mer. 654, one of the questions was upon these words in a will, "to all and every the child and children of my daughter S. M. for life; and, after the decease of such child and children, to the lawful issue of such child

and children, to hold to such issue, his, her and their heirs, as tenants in common ; and, in default of such issue, over to other persons."

S. M. had nine children, four born in the testator's life and five after his decease. Upon a case sent to the K. B., where it was ably argued, the judges certified, that all the nine children of S. M. took estates in tail general, as tenants in common, with cross remainders ; and afterwards, upon further arguments in the court of chancery, Sir Wm. Grant, M. R. declared himself of the same opinion ; and, decreed accordingly. The limitation in that case to the lawful issue,.to hold to such issue, his, her and their heirs, as tenants in common, bears so close an analogy to the present, as to render the decision one of direct authority.

There is another view, which may be taken of the question : as to the effect of coupling a limitation to " heirs of the body" or, to " issue," with words of modification inconsistent with the course of devolution under an estate tail, (if they should be found to be inconsistent) as where they are to take distributively, " share and share alike" or as " tenants in common, &c." In such cases, it may be observed, that the struggle has been to determine, whether such superadded words are to be taken as explanatory of an intention to use the first words of limitation in some other sense or whether the latter are to be rejected, as repugnant to the estate, which the first properly and technically create : 2 Jarman's Powell, 464.

So far as the words, " heirs of the body," are liable[c] to be controlled by subsequent expressions, the question seems to be settled by the case of *Jesson* v. *Wright*, in the House of Lords, by the concurrent opinions of Lords Eldon and Redesdale : 2 Bligh's R. 1.

Here, was a devise to W. for life ; and, after his decease, to the heirs of his body, " in such shares and proportions, as W., by deed, should appoint ; and, for the want of such appointment, to the heirs of the body of W., share and share alike as tenants in common ; if but one child, the whole to such only child ; and, for want of such issue, to the heirs of the devisor." It was held, that an estate tail vested in W., notwithstanding it was inconsistent with such an estate that it should be subject to the appointment in shares and for want

of such appointment, that heirs of the body should share alike, as tenants in common; these additional words being rejected as superfluous. This case expressly overrules *Doe* v. *Goff*, 11 East, 668, and it is a strong decision in favor of the rule, that technical words shall have their legal effect, unless, from subsequent inconsistent words, it is very clear that the testator meant otherwise ; and furthermore, that it is dangerous, where words have a fixed legal effect, to suffer them to be controlled, without the clearest evidence, from other expressions, that the testator intended they should not have that legal effect. The same rule is laid down and enforced in explicit terms in 1 Preston on Estates, in various places ; and it results, as a necessary consequence, from the object of the rule in Shelly's case, which frequently operates so as to frustrate the intention. Even an express declaration, that *heirs* or *heirs of the body* shall take by purchase, will not singly and alone exclude the rule. 1 Preston on Est. 326.

The principle established by *Jesson* v. *Wright*, seems equally applicable to the case of an estate limited to "lawful issue," as giving an estate tail ; and if it be necessary to preserve the full effect of those words, (as words of limitation) that superadded words should be rejected, I think the court is warranted in rejecting them. This was done in *Brant* v. *Gelston*, 2 John. Cas. 384.

The conclusion to which I am drawn, is, that the devises to the daughters, Deborah and Frances, give to each of them, according to the rules of the common law, an estate tail in their respective fourth parts of the lands devised (upon a fair legal construction of the limitation to *their lawful issue*,) which estate the statute converts into a fee simple.

This construction may appear to be at variance with what is supposed to have been the intention of the testator, when it is perceived that, in another clause of the same will, he has devised, by proper and apt words, sufficient to pass an absolute fee, another fourth part of his estate to his son Andrew ; and the question has been asked, why did he use another form of devising clause in favor of his daughters, and of his son James, if he did not intend to give them a different estate in their respective fourths ; and more especially since he knew or must be supposed to have known, that an estate tail could not be

permitted to exist for one moment under our laws ?   The an-
swer is obvious.   He probably did intend to give them a dif-
ferent estate from his son Andrew and had no idea of creating
an estate tail, which, by operation of law, would come to the
same thing as an absolute devise in fee simple ; but, at the
same time, he has employed words and expressions to which
the law has attached a meaning and the court is compelled to
give to them that effect, though it may frustrate some part of
his intention.   Lord Eldon remarked, in *Jesson* v. *Wright*,
" according to the words of the will, it is absurd to suppose,
that the testator could have had such an intention, as the rules
of law compel us to ascribe to his will," and Lord Redesdale
concluded by saying, " if the testator had considered the effect
of the words he used, and the rule of law operating upon
them, he probably would have used none of the words in the
*will* ;" and still they were bound to construe it according to its
legal effect.

There is, indeed, one circumstance, which goes to show
that the testator could not have intended mere life-estates to
his daughters.   Deborah was unmarried when the will was
made and when he died.   The will contains no limitation over,
in the event of her dying without issue ; and a lapse will be
the consequence in that event, unless she takes a greater es-
tate than for life ; and it is not to be supposed, that he intend-
ed to die intestate as to any portion of his property—the pre-
sumption is the other way.

Having thus settled the construction of the two clauses of
the will, in which Deborah and Frances are named, the same
must be adopted in respect to the devising clause in favor of
James.   He would have been entitled, if living, to a like es-
tate of inheritance ; and his sons could have taken through
him, only by descent, and not as purchasers.   The revocation,
therefore, of the bequest and devise to him, deprives them of
all claim to that specific portion ; for no other purpose was it
necessary to make an express revocation by the codicil.   His
life estate, if nothing more was intended, and his interest in
the personal property, so far as that was included, ceased at
his death.

The codicil, in this respect, may be, therefore, considered
as helping the construction which I have adopted.   All parts

of the will and codicil, taken together and made to speak as one instrument, (which is the proper mode of considering them,) are, by this means, reconciled and made consistent.

From what I have experienced in examining the law of this case, I cannot close without expressing my entire conviction of the wisdom and policy of the provisions introduced into the late revision of our statutes, by which the rule in Shelly's case is thenceforth abolished in this state; a rule, simple in itself, but attended with greater uncertainty and difficulty in its application than any other within the whole range of the common law.

The decree will declare Deborah and Frances, each, entitled to a fourth part of the property, both real and personal, absolutely, after providing for and paying the debts, annuity and pecuniary legacies given by the will and codicil.

Philip and Richard, the two infant sons of James, are entitled, under the will and codicil, to only one thousand dollars each, to be invested for their use as directed by the codicil and subjected to the contingencies of their deaths, as therein mentioned. That one fourth of the estate, the devise of which lapsed by the death of James, or was revoked by the codicil, must be divided into six parts, so as to give the daughter Elizabeth one equal share thereof; the codicil, in my opinion, not having the effect to exclude her from a share in that portion of the property of which the testator must still be considered as dying intestate. Deborah, Frances, Andrew and Mrs. Smiley each one sixth; and the children of James, the remaining one sixth between them.

The costs of all the parties to this suit to be paid out of the estate at large.