CLYDE EMANUEL BURRELL, JR. *v.*
STATE OF MARYLAND

[No. 843, September Term, 1978.]

*Decided April 11, 1979.*

The cause was submitted on briefs to THOMPSON, LOWE and WILNER, JJ.

Submitted by *Joseph F. Murphy, Jr.,* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Kathleen M. Sweeney, Assistant Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *Bruce Bellin, Assistant State's Attorney for Baltimore County,* for appellee.

WILNER, J., delivered the opinion of the Court.

March 10, 1978, was a Friday, and that meant it was payday for Clyde Burrell, Jr. and Curtis Williams. Having completed

the night shift at Bethlehem Steel, they left work early Friday morning, armed with their week's pay, and repaired to the North Point Liquor Store, as apparently was their weekly habit. Williams said he got there about 9:30 a.m., just after leaving work. Burrell arrived about 12:30 p.m.

At some point around midafternoon, after each of these gentlemen had consumed a fair amount of spirituous potion, they removed themselves to the parking lot outside the store for a friendly game of Tonke. Tonke is a card game, the precise rules of which are not fully described in the record and are not sufficiently well-known to this Court to permit the taking of judicial notice; but the game does clearly permit the placing of wagers upon its outcome. Indeed, it was not the love of the game itself that induced this adventure. It was, alas, that both were flushed with their paychecks, conveniently cashed for them by the neighborly spirit shop, and they were settling down to a little gambling.

As sometimes is known to happen in these situations, a dispute arose with respect to the proper interpretation and application of one of the rules of the game. Mr. Burrell attempted to explain the precise nature of the dispute — the text of the rule that was allegedly violated and the manner of its alleged violation — but we must confess that the explanation is lost on us. Fortunately, this case does not depend upon such an understanding. Suffice it to say that Mr. Williams picked up $10 from the pot without the concurrence of Mr. Burrell, who attempted to explain to Mr. Williams why, under the rules of the game, his pocketing of the money was inappropriate. Mr. Williams remained unconvinced.

Very quickly, the dispute left the arena of patient logic and calm, rational debate and dropped to a considerably less lofty but much more frequent forum for the resolution of such disputes. Mr. Williams lunged at Mr. Burrell with a knife. He missed, however, and was, at least temporarily, suitably restrained.

The narrative to this point is essentially undisputed. Also undisputed is that, at some later time, Mr. Burrell went to his car, got a .38 caliber pistol, and with it shot Mr. Williams in the chest and in the leg. The critical area of controversy is

the extent to which this shooting was provoked by Mr. Williams' intervening actions — whether, in other words, Mr. Burrell was acting in self-defense. The context in which this controversy arose and was resolved was Mr. Burrell's trial in the Circuit Court for Baltimore County, sitting without a jury, for assault with intent to maim and use of a handgun in the commission of a crime of violence.

Mr. Williams, though admitting having a knife and going after Mr. Burrell with it once, said that that had occurred at least an hour before the shooting. His version was that the argument had ended, that he was walking toward his car and away from Burrell, his knife in his pocket, when Burrell shot him from a distance of about two car lengths. Burrell, as might be expected, described a somewhat different sequence of events. The argument continued, he said, despite his persistent attempts to end it. Williams taunted him, cursed him, and came at him not once but on at least three occasions with the knife. It was he — Burrell — who walked away. He went back into the liquor store, bought some pig knuckles, and started for his car when Williams came at him again. Twice Williams shoved him, and advanced once more with the knife. It was at this point that Burrell shot him once in the chest. Undaunted, Williams came at him one more time with the knife and Burrell shot him in the leg. Burrell then drove away, but subsequently turned himself in to the Baltimore City police.

Two neutral witnesses testified for the State. Robert Ware was inside the North Point Liquor Store, along with quite a few other people, when the crowd suddenly rushed to the window facing the parking lot. Ware looked up (*i.e.,* out of the window) just in time to see Burrell shoot Williams. Ware said that he was about 100 to 125 yards away from where this occurred, but no one questioned his ability to see what he described. He did not see a knife. Indeed, he only looked up for the two or three seconds when the actual shooting occurred, and could not tell whether, at that moment, Williams was walking away from Burrell. When asked how far apart the two men were, he said "from here to that wall" which, in the absence of any more precise quantification,

leaves this Court in a bit of a quandry as to how far that really was.

The second neutral witness was police officer Albrecht, who had investigated the shooting. No weapon was recovered — not a knife and not the gun. He testified as to an oral statement given to him by Burrell later in the day, which was generally consistent with the story given by Burrell in court.

Upon this evidence, the court convicted Burrell on both charges and sentenced him to prison for a total of eight years (five years for assault with intent to maim and three years, consecutive, for the handgun offense).

At the end of the State's case (and the overruling of his motion for judgment of acquittal), Burrell elected to testify in his own defense. This was not, however, until after he had been warned by his attorney that, if he did testify, the court and the State's Attorney could ask questions about "any record you have since you have been eighteen years of age, where you have been represented by counsel or where you have in fact waived your right to counsel." "That is", said the attorney, "any convictions can be brought out."

So warned, appellant took the stand and gave his version of what occurred. Not to make a liar out of defense counsel, the State's Attorney did indeed inquire, upon cross-examination, about several prior convictions. He first asked a general question — have you ever been convicted of a criminal offense while represented by counsel — but, at the court's suggestion, then got more specific. He asked about a 1970 conviction for disorderly conduct, to which the court sustained an objection based on the fact that such a crime was not one of moral turpitude. *Compare Cousins v. State,* 230 Md. 2 (1962). He then asked about a 1973 assault conviction, to which the court overruled an objection with the comment, "I think that that has some relevance to this case." Finally, the State brought out that in 1975, appellant had been convicted of a "deadly weapon charge", without specifying the offense further.

Appellant's sole complaint in this appeal is that the court erred in allowing the evidence of his 1973 assault conviction. Pointing up the court's remark as to the relevance of that

conviction in the light of our decision in *Thomas v. State,* 29 Md. App. 45 (1975), he assumes that the trial court recognized that the assault conviction would be irrelevant, and therefore inadmissible, for the purpose of impeaching appellant's credibility as a witness, and therefore postulates that the court accepted the conviction as bearing directly on the issue of whether appellant was the aggressor in this instance. This, he alleges, would be equally, if not more, impermissible.

We do not share appellant's interpretation of why — for what purpose — evidence of his earlier assault conviction was admitted. He reads too much into the court's response to the objection expressed by counsel, and, in effect, damns the court with very faint praise. He credits the court with knowing of the concerns expressed in *Thomas* about the relevance of an assault conviction to one's credibility as a witness, and yet implicitly charges the court with ignorance of a far more fundamental principle.

Clearly, a conviction for assault occurring five years ago is inadmissible as substantive evidence bearing on the ultimate issue of appellant's guilt in the instant proceeding. *Cross v. State,* 282 Md. 468 (1978). We presume that the trial court was aware of that rather basic tenet; certainly, a fair and unstrained reading of the record lends no support to the contrary. What the court obviously meant was that, in contrast to the 1970 conviction for disorderly conduct, which had no relevance for any purpose, the assault conviction, being more recent and more serious, would be relevant with respect to the issue of appellant's credibility as a witness. Would the fact that he had once before been convicted of assault make him less likely to be truthful in his testimonial account of this incident? That, it seems to us, is the question to which the court believed this evidence to be relevant, and that was the purpose for which it was admitted.

The questions are then posed: does a conviction for simple assault, especially one that occurred five years earlier, necessarily indicate a propensity toward lack of credibility? Is such evidence admissible even for purposes of impeachment?

Under the current state of the Maryland law, gleaned from

the Opinions of the Court of Appeals and of this Court, the unequivocal answer to these questions is: maybe.

The "maybe," as we shall see, is derived from the underlying rules laid down by our Court of Appeals concerning the impeachment of witnesses generally through a showing of their past criminal behavior. We, of course, are bound by those principles as enunciated by our State's highest court — we may neither ignore nor alter them; and we shall decide this case, as indeed we must, in what we hope and believe is full conformance with them. We do not think it inconsistent with our bound obeisance, however, to take account of a growing reexamination of those precepts by courts, legislatures, and commentators across the nation, and to throw open the question of whether they should be reconsidered in Maryland.

It has long been the law of this State, and generally throughout the country, that a defendant in a criminal case who elects to testify in his own defense "thereby subjects himself to the same rules of cross-examination that govern other witnesses" and "may properly be cross-examined as to his prior criminal record." *Davis v. State,* 237 Md. 97 (1964), *cert. den.,* 382 U. S. 945 (1965). *See also Braxton v. State,* 11 Md. App. 435 (1971); 3A Wigmore *Evidence* § 890 (Chadbourn rev. 1970); Anno., *Cross-Examination — Other Prosecutions;* 161 A.L.R. 233, 103 A.L.R. 350, 25 A.L.R. 339, 6 A.L.R. 1608. This proceeds from a blending or confluence of three more basic propositions: (1) the credibility of a witness is always a relevant issue in any case — civil or criminal; (2) a person who has shown himself to be untrustworthy in the past may be untrustworthy in the present, a corollary hypothesis of which is that a person who has engaged in criminal activity involving some element of dishonesty or significant lack of moral commitment may have a lesser propensity to tell the truth than one who has not engaged in such activity; and (3) a criminal defendant electing to testify puts his credibility in issue, and that credibility may be tested, impeached, impugned as it could with any other witness.

The controversy that has recently been brewing over the ultimate product of this confluence — the ability to

cross-examine a criminal defendant about his prior criminal record — has centered around the second and third underlying propositions.

As regards the second, there has been a rather significant reexamination of the extent to which it actually retains validity. What kinds of criminal activity really relate to one's propensity to be a truthful witness? Quite apart from who the witness is or whether any collateral prejudice may result, the inquiry here concerns the basic relevance of the conviction in question to the person's credibility as a witness. The attack on the third proposition is directed not so much at its inherent validity, but rather at its omission to consider and take account of the collateral prejudice that may arise when the defendant himself is the witness.

When dealing with a mere witness — someone other than the defendant himself — it is not so difficult for the trier of fact to consider- evidence of prior convictions solely in the context of the credibility of the witness. Indeed, such evidence, in most cases, would have no other function. When it is the *defendant's* criminal history that is being inquired into, however, there is a more pervasive potential for prejudice that must be considered — that which is likely to emanate from advising the trier of fact that the very person standing in judgment before it is already a convicted criminal. And that prejudice looms especially large when the earlier crime is similar to that for which he is currently in jeopardy.

This is a problem that has not gone unrecognized. In *Loper v. Beto,* 405 U. S. 473 (1972), for example, the Supreme Court observed in footnote 11 at pp. 482-83:

> "That a record of prior convictions may actually do more than simply impeach a defendant's credibility has been often noted. See, *e.g.,* C. McCormick, Evidence, § 43, p. 93 (1954):
>
>> " 'The sharpest and most prejudicial impact of the practice of impeachment by conviction . . . is upon one particular type of witness, namely, the accused in a criminal case who elects to take the stand. If the accused is forced to admit that he

has a "record" of past convictions, particularly
if they are for crimes similar to the one on trial,
the danger is obvious that the jury, despite
instructions, will give more heed to the past
convictions as evidence that the accused is the
kind of man who would commit the crime on
charge, or even that he ought to be put away
without too much concern with present guilt,
than they will to its legitimate bearing on
credibility.' " [1]

*See also* the comment made in 22 Md.L.Rev. 244, 246 (1962):
"The impeachment uses of prior convictions, like the
substantive uses, are beset with considerations which often
necessitate the exclusion of the prior convictions as a vehicle
of impeachment. The problem is most acute when the witness
is the criminal defendant."

The danger of a trier of fact drawing an improper inference
from evidence of prior convictions has led the Court of
Appeals to place extensive restrictions upon the admissibility
of such evidence for any substantive purpose. *See, for
example, Ross v. State,* 276 Md. 664 (1976); *Cross v. State,
supra,* 282 Md. 468. Thus, as we indicated before, if this prior
assault conviction had been offered for the purpose of
showing that appellant committed *this* assault — that he was
an aggressive or vicious person *likely* to commit this assault
— it would flatly have been inadmissible.

Yet the courts and text writers have long recognized the

---

1. Some further evidence of the Supreme Court's concern about the
collateral effect of questioning a criminal defendant as to prior convictions
appears in the actual text of the *Loper* Opinion. *Loper* itself dealt with
whether a prior conviction obtained where the defendant was not represented
by counsel — *i.e.,* in contravention of the Sixth Amendment right enunciated
in Gideon v. Wainwright, 372 U. S. 335 (1963) — was admissible for
impeachment purposes. In that context, the Supreme Court quoted (as being
unable to express better) this passage from Gilday v. Scafati, 428 F. 2d 1027,
1029 (1st Cir., 1970), *cert. den.,* 400 U. S. 926 (1970): "We conclude that the
*Burgett* [*v. Texas,* 389 U. S. 109] rule against use of uncounseled convictions
'to prove guilt' was intended to prohibit their use 'to impeach credibility,' *for
the obvious purpose and likely effect of impeaching the defendant's
credibility is to imply, if not prove, guilt."* (Emphasis supplied.) *Compare*
Taylor v. State, 28 Md. App. 560 (1975), *aff'd,* 278 Md. 150 (1976), dealing with
the cross-examination of character witnesses offered by the defendant.

fiction that triers of fact — whether judge or jury — have that remarkable ability to comprehend, to take cognizance of and internalize, such prejudicial information, but to disregard it — to put it entirely aside — in its most likely and therefore most prejudicial context and yet to regard it and give it effect for a much more limited and much more abstruse purpose, as an indicator of the defendant's propensity to tell the truth. *See, for example, Michelson v. United States,* 335 U. S. 469, 484-87 (1948); *Spencer v. Texas,* 385 U. S. 554 (1967), *reh. den.,* 386 U. S. 969 (1967).

Most States have statutes expressly permitting the impeachment of witnesses by showing prior convictions of one type or another, and these statutes rarely, if ever, distinguish between criminal defendants and other witnesses. *See* 3A Wigmore, *Evidence* § 987 (Chadbourn rev. 1970), for a compilation of these statutes and how they have been interpreted. This may explain, at least in part, why some courts have continued to follow the traditional rule permitting such form of impeachment. *See, for example, Marshall v. Martinson,* 518 P. 2d 1312 (Or. 1974); also *State v. Ruzicka,* 570 P. 2d 1208 (Wash. 1977). Yet, notwithstanding such statutes or their own prior decisions, a number of courts (and legislatures) have recognized the serious nature and effect of the prejudice that emanates from the rule, and have either limited its scope generally or abandoned or modified the rule when dealing with the cross-examination of criminal defendants. (*See* Appendix attached to this Opinion for a summary of the recent developments in this area around the country.) Maryland has such a statute (Courts article § 10-905), which permits a witness to be cross-examined as to convictions of "infamous" crimes. Rather than departing from this statutory rule, however, our courts have actually expanded its scope by permitting convictions for other than infamous crimes also to be used for impeachment purposes.

The current rule in Maryland was expressed by the Court of Appeals in *Cousins v. State, supra,* 230 Md. 2, at 4-5, as follows (citations omitted):

"It has been held by this Court that evidence of the accused's previous conviction of crime need not

be restricted to infamous crimes or those involving moral turpitude, provided the violation of law may have some tendency to show that the person charged is not to be believed under oath. . . . In such instances the exercise of discretion by the trial judge will not be interfered with on appeal unless the fact of the prior conviction is clearly irrelevant. . . . Where the conviction was for a crime not infamous, the length of time since it occurred considered with the nature of the crime has been deemed pertinent in deciding relevancy. . . . We think that where the prior conviction was for an infamous crime, evidence of it is admissible without reference to the time of its commission, for such bearing and weight on credibility as the trier of fact may give it under the circumstances."

*See also State v. Huston,* 281 Md. 455, 460 (1977), where the Court reaffirmed as "the reason for considering a prior conviction of a witness as reflecting upon his credibility" that which had earlier been stated in *Burgess v. State,* 161 Md. 162 (1931):

" 'The issue always is the truth of the witness' testimony. In other words, is the witness devoid of moral perception, such a person as would regard lightly the obligations of an oath to tell the truth? In judging of a man's moral fibre, his previous conduct, covering a reasonable time before the inquiry, undoubtedly has a real and substantial bearing upon the question. It seems to us that there can be little argument that previous conduct of a witness can be shown to be such as, by the common experience of the average man, would justify a belief of his unworthiness as a witness. Certainly if it be shown that a witness had previously been convicted of perjury, it would materially discredit, if not entirely destroy, the value of his testimony. Conviction of many other crimes could properly have the same effect; while, on the other hand, there may

be convictions of violations of hundreds of police regulations, which in no real or true sense can be taken as tending to make one so convicted unworthy of belief.' . . ."

It would seem from these pronouncements that if the prior conviction was for an "infamous" crime, it is admissible for impeachment purposes regardless of who the witness is or how long ago the conviction was obtained. The presumed bearing of an "infamous" crime on one's trustworthiness as a witness is so great that it remains admissible "without reference to the time of its commission, for such bearing and weight on credibility as the trier of fact may give it under the circumstances." *Cousins v. State, supra,* at p. 5.

If, on the other hand, the earlier crime was not an "infamous" one, there seem to be three elements or considerations that interplay with each other and ultimately govern admissibility in Maryland. The first of these is the nature of the crime itself. Is it one which so involves the element of deceit, or lying, or dishonesty that could lead a rational person reasonably to conclude that one who would commit such a crime would be less likely to speak the truth than one who would not commit such a crime? If the answer is "yes," then, at least *prima facie,* the evidence is deemed relevant. If the answer is "no," the evidence is considered to be "clearly irrelevant" and simply not admissible. *See Linkins v. State,* 202 Md. 212 (1953).

The second element is that of time. When was this earlier crime committed? Obviously, as a general rule, the farther in the past the indiscretion occurred, the weaker is its relevance to present credibility. It is somewhat akin to the law of gravity: the farther away one is from the mass, the less is its gravitational pull or influence. But, like another aspect of the law of gravity — the larger the mass, the stronger is its pull at any given distance — so it is that the more enormous the earlier crime (*i.e.,* the more it embodies and therefore exudes dishonesty), the more likely will be its relevance, and thus its admissibility, even after the elapse of long intervals. With respect to other than infamous crimes,

therefore, admissibility for impeachment purposes seems to be a function of a more or less direct ratio between the degree of dishonesty inherent in the earlier crime and the time elapsed since its commission. The greater the degree of dishonesty inherent in the earlier crime, the longer is the period of time since its commission that the conviction remains relevant, and therefore admissible, for impeachment purposes. *See,* in general, Anno., *Impeachment of Accused — Remote Offense,* 67 A.L.R.3d 824, *et seq. Also, Simond v. State,* 127 Md. 29, 38-39 (1915).[2]

The third element, which, in a sense, acts as the mechanism for weighing and blending the first two, is that of judicial discretion. This is what provides the flexibility necessary to amalgamate these various concepts in a fair and sensible way and to balance them against any collateral prejudice resulting from the reception of such evidence. The Court of Appeals first recognized this in *Nelson v. Seiler,* 154 Md. 63 (1927), when, in considering the types of offenses that might be fairly reflective of one's propensity to be a truthful witness, it observed at p. 69:

> "No rigid classification seems possible. The principle generally adopted by courts which follow otherwise the practice followed in Maryland is that the trial court must exercise discretion when offers of convictions are made, looking to the purpose for which the evidence is offered, and that its decision will not be interfered with on appeal except when the evidence is so clearly irrelevant that its admission

---

2. *Simond* illustrates, to some extent, the Court's attempt to strike a proper balance between relevance and prejudice. At the time, the law, established by earlier cases, was that a witness could be asked whether he had ever been confined in jail. *See* Smith v. State, 64 Md. 25 (1885); McLaughlin v. Mencke, 80 Md. 83 (1894). In *Simond,* the trial court refused to allow a State's witness to be asked whether, ten years earlier, he had been arrested, fined, and sent to jail for being drunk on the street. Conceding that the court's refusal to permit the questions was, under *Smith* and *McLaughlin,* error, the Court of Appeals nonetheless sustained the conviction, noting: "The object of such testimony is to reflect upon the credibility of the witness, and it would be pretty close to reflecting upon the intelligence of the jury to suppose they would be influenced in passing on the credibility of a witness by evidence of such an incident happening ten years before." *Simond, supra,* at 39.

could not be said to be within the discretion lodged with the trial court. . . . And this we take to be the principle we are required to follow in Maryland." (Citations omitted.)

*See also Burgess v. State,* 161 Md. 162 (1931), where the Court again concluded that the extent to which a prior conviction of a non-infamous crime may be used to impeach the credibility of a witness was "in the sound discretion of the trial court, whose judgment in such matter should not be disturbed on appeal except in clear cases of error." *Burgess* involved a prosecution for larceny of an automobile and 90 gallons of whiskey being transported in it. It appears to have been a hijacking of illicit whiskey — something out of *The Untouchables.* Upon cross-examination, the driver of the hijacked car, whom the Court considered to be the "prosecuting witness," was asked about an assault conviction occurring five years earlier, which the trial court refused to permit.

Without determining directly whether assault was one of those crimes so bearing upon one's trustworthiness as a witness as to make it relevant for impeachment purposes or, if so, how recent the conviction must be in order to retain its relevance for that purpose, the Court simply declined to disturb the discretion exercised by the trial court. It affirmed the ruling below, noting at p. 174:

"... [W]e are not prepared to say that, under these circumstances, the ruling of the court was so clearly wrong as to call for a reversal of the judgment. Especially is this true when it is shown by the record that the jury had the full benefit of inquiry into the witness' past life sufficient to indicate to them the probable character of the witness."

Implicit in this somewhat equivocal explanation, it seems to us, is that if the trial court had allowed the question, rather than having excluded it, its decision may also have been affirmed upon the same reasoning. Indeed, on at least three occasions, the Court of Appeals, in various contexts, has

permitted a witness to be cross-examined about prior assault convictions.

In *Balto. & Ohio R. Co. v. Strube,* 111 Md. 119 (1909), a special policeman employed by the railroad had arrested a young man for trespassing on the railroad's property. The lad arrested sued the railroad for assault — excessive violence committed upon him in connection with the arrest. The Court permitted the arresting officer, who was, of course, the real alleged tortfeasor, to be asked (1) "How often have you been convicted of assault in Baltimore City or Baltimore County," and (2) "You were arrested and convicted at the Southwestern Police Station for this assault upon Strube, were you not?" 111 Md. at 125.

The Court of Appeals, in reviewing the allowance of these questions, said, at pp. 125-26:

> "The ground upon which this evidence is sought to be justified is that it 'goes to the credibility of the witness.' More properly speaking it may be said to affect the weight of the witness' testimony in this case. Indeed the first question seems to have been framed with a view to eliciting information concerning the witness' general disposition for fighting. But in either aspect we think the question was admissible under the circumstances.
>
> "The issue was whether McCarron had made an unjustifiable assault upon the plaintiff. The plaintiff's testimony tended to prove that the assault was not justified. McCarron's tended to prove that it was. If the answer to the first question had shown that McCarron had been convicted of a number of assaults it would have reflected upon the weight of his testimony as the justification for the assault in this case. The answer however was of such a negative character as to be of little value either for or against the plaintiff and even if error it would have been harmless error.
>
> "The second question objected to, is admissible for the same reason as the first. The answer affects the weight of McCarron's testimony as to the character

of the assault, and therefore in a sense his credibility as a witness. The case of *Mattingly v. Montgomery*, 106 Md. 461, is directly in point. The cases cited by appellant in support of its contention that such evidence is not admissible are not apposite.

"*Such evidence would not be admissible in chief for the purpose of proving the fact of the assault, but the questions are proper upon cross-examination of the person charged with committing the assault.*" (Emphasis supplied.)

The matter arose again, in a somewhat more analogous context, in *Linkins v. State, supra,* 202 Md. 212. The defendant was charged with robbery, assault, and related offenses. He testified in his own defense, and, on cross-examination, was asked whether he had once been convicted of assault on an officer, the date of the queried conviction being unspecified. The Court reiterated much of what it had said in *Nelson v. Seiler, supra* — that, while not restricted to infamous crimes or those involving moral turpitude, "such convictions should be for law violations which may have some tendency to impeach defendant's credibility as a witness." It said:

"The court must exercise discretion and its decision will not be interfered with on appeal, *except when the evidence is so clearly irrelevant that its admission could not be said to be within the discretion of the trial court. ... We find no error.*" (Citations omitted.) (Emphasis supplied.) *Linkins, supra,* at 220-21.

It was at that point that the Court noted that the defendant's answer to the question was tantamount to a denial, but whether this had any bearing upon the Court's conclusion that no error was committed is not altogether clear.

In *Taylor v. State,* 226 Md. 561 (1961), the defendant, charged with murder (shooting the victim with a rifle), conceded the State's ability to question him, on cross-examination, as to prior convictions generally, but

objected to being required to admit that one of those convictions (or perhaps the only one) was for assault with a deadly weapon occurring two years earlier. The Court affirmed the allowance of the question. Referring to its prior decisions, the Court concluded, at p. 567:

"Though there are authorities elsewhere that a conviction for assault does not bear upon credibility, that rule seems inconsistent with our *Linkins* and *Strube* cases. Under those cases and others above cited, including *Burgess,* we think that the admissibility on cross-examination of the appellant's prior conviction for assault for the purpose of impeaching his credibility was to be determined by the trial court in the exercise of its discretion; and we think that on this phase of the case, too, no abuse of discretion has been shown. *The evidence admitted was not clearly irrelevant."* (Emphasis supplied.)

The Court of Appeals has thus made clear that a prior conviction for assault is not *per se* inadmissible as having an insubstantial relevance to one's credibility as a witness, but, by relegating the question of ultimate admissibility to the trial court's discretion, has affirmed decisions both ways. This Court has done likewise, for much the same reason. *See, for example, Huber v. State,* 2 Md. App. 245 (1967); *Stewart v. State,* 4 Md. App. 565 (1968), and *Cook v. State,* 8 Md. App. 243 (1969), where such convictions were deemed admissible for the purpose of impeaching the credibility of the defendant, and *Thomas v. State,* 29 Md. App. 45 (1975), where we affirmed the trial court's exclusion of such a question directed at a non-defendant witness.

Discretion, of course, is not a fixed and rigid thing. It implies the exercise of sound judgment in the light of what is in fact before the court. The same ruling may, in one setting, be an entirely reasonable exercise of discretion and in another constitute a gross abuse of that discretion. *See Worthen v. State,* 42 Md. App. 20 (1979). In light of the concepts expressed in *Burgess,* and repeated subsequently in *Linkins, Taylor, Cousins,* and *Huston,* it is not for us to

declare absolutely that a five-year old conviction for assault is admissible or inadmissible for impeachment purposes in any given context. We believe, however, that, even under the current state of the Maryland law, when it is the defendant himself who is being asked such questions, the court's discretion is considerably narrower than when some other witness is being challenged; and where a jury is involved, the range of discretion grows smaller yet.[3]

This was a court trial. Without objection, the court learned of an even more recent (1975) conviction on a deadly weapon charge, which would seem to have at least an equal, if not a deeper, relevance to one's propensity to be truthful than does assault. Moreover, the court made clear in its ruling from the bench that it was deciding the case primarily upon the testimony of the neutral witness, Mr. Ware, whose account (depending upon the distance "from here to that wall") apparently corroborated that given by the victim. In short, under the circumstances of this case, we cannot say that the court abused its discretion in permitting the question about the assault conviction. In point of fact, we don't think, from

---

3. We are not unaware that *Burgess, Linkins,* and *Taylor* each involved a jury trial. However, the special prejudice that may arise from such a setting was not articulated in those cases. We think that it should be mentioned and taken into account, however, in the exercise of the court's overall discretion. In this context, see:

(1) State v. Babb, 258 Md. 547, 550 (1970): "The assumed proposition that judges are men of discernment, learned and experienced in the law and capable of evaluating the materiality of evidence, lies at the very core of our judicial system. Such an assumption would be completely unwarranted with regard to a jury of laymen and the impact which evidence may have upon their deliberative powers."

(2) Concurring Opinion by Mr. Justice Jackson in Krulewitch v. United States, 336 U. S. 440, 453 (1949): "The naive assumption that prejudicial effects can be overcome by instructions to the jury [citations omitted], all practicing lawyers know to be unmitigated fiction." Also the statement in Bruton v. United States, 391 U. S 123, 135 (1968): ". . . [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."

this record, that it made any difference whatever to the outcome of the case.

*Judgment affirmed; appellant to pay the costs.*

## APPENDIX

The reevaluation of the traditional rules concerning the cross-examination of witnesses generally, and criminal defendants in particular, has taken different forms, and has been a slow process.

The Federal courts, and subsequently the Congress, have attempted to deal with the problem by circumscribing the rule generally — limiting the type of prior conviction evidence admissible against any witness — rather than concentrating on the specific application of the rule to criminal defendants who testify.

In *Luck v. United States,* 348 F. 2d 763 (D.C. Cir. 1965), the Court concluded that, under the District of Columbia Code, a trial court was not *required* to allow impeachment by prior conviction every time a defendant testifies. It had discretion in the matter, and in the exercise of that discretion would be required to consider whether "the prejudicial effect of impeachment far outweighs the probative relevance of the prior conviction to the issue of credibility." 348 F. 2d at 768. The Court listed a number of factors that might be relevant in making this determination: "the nature of the prior crimes, the length of the criminal record, the age and circumstances of the defendant, and, above all, the extent to which it is more important to the search for truth in a particular case for the jury to hear the defendant's story than to know of a prior conviction." *Luck, supra,* at 769.

The rule announced in *Luck* was somewhat general but defendant-oriented. In *Gordon v. United States,* 383 F. 2d 936 (D.C. Cir. 1967), *cert. den.,* 390 U. S. 1029 (1968), the Court applied more specific limitations, but did so in a more general

way. In an Opinion authored by now Chief Justice Warren Burger, the Court observed, at page 940:

". . . In common human experience acts of deceit, fraud, cheating, or stealing, for example, are universally regarded as conduct which reflects adversely on a man's honesty and integrity. Acts of violence on the other hand, which may result from a short temper, a combative nature, extreme provocation, or other causes, *generally have little or no direct bearing on honesty and veracity.* A 'rule of thumb' thus should be that convictions which rest on dishonest conduct relate to credibility whereas those of violent or assaultive crimes generally do not; traffic violations, however serious, are in the same category." (Emphasis supplied.)

The Second Circuit Court of Appeals fashioned a somewhat different rule. In *United States v. Palumbo,* 401 F. 2d 270 (2nd Cir. 1968), *cert. den.,* 394 U. S. 947 (1969), the Court viewed the allowance of prior conviction evidence as discretionary, but concluded that the court may bar it if it finds that the prior conviction "negates credibility only slightly but creates a substantial chance of unfair prejudice, taking into account such factors as the nature of the conviction, its bearing on veracity, its age, and its propensity to influence the minds of the jurors improperly." 401 F. 2d at 273.

This groping for a proper balance between relevance and prejudice infected the Halls of Congress as well, the inhabitants of which have resolved the matter, at least for the present, by the adoption of Rule 609 of the Federal Rules of Evidence. This Rule was perhaps the most extensively debated of any of the new Federal Rules. *See* 3 J. Weinstein & M. Berger, *Weinstein's Evidence,* § 609-2, *et seq.* (1978). The changes made by the Rule from the maxims announced in *Luck* and *Gordon* are delineated in *United States v. Smith,* 551 F. 2d 348 (D.C. Cir. 1976). The Rule permits a prior conviction to be used to impeach the credibility of a witness (any witness) only if the crime (1) was punishable by death or imprisonment for more than one year *and the court determines that its probative value outweighs its prejudicial*

*effect to the defendant* or (2) involved dishonesty or false statement, regardless of the punishment. A conviction more than ten years old is not admissible unless the court determines that its probative value "supported by specific facts and circumstances substantially outweighs its prejudicial effect." *See United States v. Cavender*, 578 F. 2d 528 (4th Cir. 1978). At the very least, where the earlier crime is not one involving dishonesty or false statement, the court must make the balancing determination, possibly on the record. *See United States v. Smith, supra*, 551 F. 2d at 357 (footnote 17).

An open question is whether, by virtue of Federal Rule 403, the balancing test must be made even where the earlier crime involved dishonesty or false statement. Rule 403, applicable to *any* evidence, provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In New Mexico, where these Federal rules have been adopted as part of the State law, the balancing test required under Rule 403 has been applied even to crimes involving dishonesty or false statement. *See State v. Day*, 577 P. 2d 878 (N.M. 1978).

A balancing test of some type — either similar to the principles announced in *Luck* and *Gordon* or to the new Federal rule — has been adopted in a number of States. Michigan, for example, adopted a composite of *Luck* and *Gordon*, and has limited the use of prior convictions to impeach a criminal defendant to "only such convictions as in the trial judge's discretion appropriately balance 'the prejudicial effect of impeachment' against 'the probative relevance of the prior conviction to the issue of credibility.' " *See People v. Downs*, 206 N.W.2d 241, 243 (Mich. App. 1973).

The Iowa Supreme Court has abandoned the liberal use of prior conviction evidence, and has ruled that a prior felony conviction is admissible only if "(1) the felony involved dishonesty or false statement, and (2) the judge determines

any danger of unfair prejudice does not substantially outweigh the probative value of such prior felony conviction, taking into account such factors as (a) nature of the conviction, (b) its bearing on veracity, (c) its age, and (d) its propensity to improperly influence the minds of the jurors." *See State v. Martin,* 217 N.W.2d 536, 542 (Iowa 1974).

In 1972, the California Supreme Court held that trial courts had discretion to exclude evidence of prior felony convictions offered as impeachment "when their probative value on credibility is outweighed by the risk of undue prejudice." *People v. Beagle,* 492 P. 2d 1, 8 (Cal. 1972). Five years later, the Court was more direct. In *People v. Rollo,* 569 P. 2d 771 (Cal. 1977), it put the trial courts under a duty "(1) to determine the probative value of that evidence on the issue of the defendant's credibility as a witness, (2) to appraise the degree of prejudice which the defendant would suffer from admission of the evidence, and (3) to weigh the foregoing two factors against each other and exclude the evidence 'if its probative value [on the issue of credibility] is substantially outweighed by the probability that its admission will ... create substantial danger of undue prejudice.' (Evid. Code, § 352)." 569 P. 2d at 774. *See also People v. Woodard,* 590 P. 2d 391 (Cal. 1979).

Tennessee, along with New Mexico (*see supra*) has adopted Federal Rule 609. *See State v. Morgan,* 541 S.W.2d 385 (Tenn. 1976). Pennsylvania has apparently opted for the *Luck* approach. *See Commonwealth v. Bighum,* 307 A. 2d 255, 263 (Pa. 1973): "Where the defendant has no other means by which to defend himself, it would be particularly unjust to subject him to the introduction of prior convictions. Or, where the prior conviction is not critically important to the Commonwealth's case — *e.g.,* where other adequate means of attacking the defendant's credibility are available — exclusion of prior convictions is strongly indicated."

The New York Court of Appeals has also adopted a form of balancing requirement, but one that is less favorable to defendants than what has heretofore been described. In that State, the defendant must inform the court of the prior convictions that might unfairly affect him as a witness, and

then has the burden of demonstrating that the prejudicial effect of the admission of such evidence "would so far outweigh the probative worth of such evidence on the issue of credibility as to warrant its exclusion." *People v. Sandoval,* 314 N.E.2d 413, 418 (N.Y. 1974). The Court also laid down fairly specific guidelines as to what types of crimes are relevant to credibility. In that context, it noted, "[t]he commission of an act of impulsive violence, particularly if remote in time, will seldom have any logical bearing on the defendant's credibility, veracity or honesty at the time of trial," but also observed that "[a] demonstrated determination deliberately to further self-interest at the expense of society or in derogation of the interests of others goes to the heart of honesty and integrity." 314 N.E.2d at 147-18. *See also People v. Davis,* 376 N.E.2d 901 (N.Y. App. 1978).

New Jersey, which has a general rule of evidence somewhat akin to Federal Rule 403, requires a balancing of relevance against prejudice, but, as New York, places the burden on the defendant to show that the one is outweighed by the other. *State v. Sands,* 386 A. 2d 378 (N.J. 1978). *See Cotton v. Commonwealth,* 454 S.W.2d 698 (Ky. 1970); *Strong v. Commonwealth,* 507 S.W.2d 691 (Ky. 1974); *Stiles v. Commonwealth,* 570 S.W.2d 645 (Ky. App. 1978), for the balancing test adopted by the Kentucky Court of Appeals, and *State v. Marquez,* 273 A. 2d 689 (Conn. 1970), for the somewhat similar standard promulgated by the Connecticut Supreme Court.

Virginia has also, by judicial fiat, limited the scope of this type of cross-examination. In that State, an accused who takes the stand may be questioned as to prior felony convictions but the name of the conviction and the details thereof may not be given, unless it was for perjury. *See Harmon v. Commonwealth,* 185 S.E.2d 48, 51 (Va. 1971).

The Supreme Court of Alaska has attempted to deal with the problem by adopting a rule of procedure that (1) limits the type of convictions admissible for impeachment purposes to those for crimes involving "dishonesty or false statement," (2) makes even those convictions inadmissible after the lapse

of five years, and (3) requires that before a witness may be impeached by such evidence, the court "shall rule if the witness may be impeached by proof of the conviction by weighing its probative value against its prejudicial effect." *See Lowell v. State,* 574 P.2d 1281, 1283 (Alaska 1978).

Illinois, pursuant to statutory mandate, permits a certified copy of a prior conviction to be admitted into evidence, but forbids such evidence to be brought out through cross-examination of a criminal defendant. *See People v. Halkens,* 53 N.E.2d 923 (Ill. 1944); *People v. Dye,* 319 N.E.2d 102 (Ill. App. 1974); *People v. Hines,* 232 N.E.2d 111 (Ill. App. 1967). A number of reasons have been advanced to support this particular modification. Part of the rationale was explained in *People v. Halkens, supra,* at 927-28, as follows:

> "... We think there is a considerable difference in the effect upon a defendant in a criminal case in cross-examining him to establish conviction of an infamous crime from that in cross-examining a witness either for the State or for the defendant. In the case of the defendant himself it will inevitably affect his defense to show he had been previously convicted of a crime, and especially to compel him to so testify himself; while on the other hand, if merely the record of conviction is offered in evidence, not only is there no humiliation of the witness, but the one fact of conviction and its purpose can be controlled by instructions...."

In *State v. McAboy,* 236 S.E.2d 431 (W. Va. 1977), the West Virginia Supreme Court of Appeals abandoned prior decisions and held that evidence of prior convictions designed to impeach the credibility of a criminal defendant would be limited to convictions for perjury and false swearing. Noting, both logically and empirically, the chilling effect that cross-examination as to prior convictions has on the willingness of defendants to exercise their Constitutional right to testify in their own defense, the Court said, at p. 436: "We believe that impeachment through evidence of prior conviction is but a remnant from a barbaric past. It stands

as one of the last vestiges of the common law harshness that denied the accused the right to testify in his own behalf." The decision as to whether a prior conviction may be used to impeach the credibility of any other witness remains within the discretion of the trial judge.

The most dramatic departure from the traditional rule was taken by the Supreme Court of Hawaii. In *State v. Santiago,* 492 P. 2d 657, 661 (Hawaii 1971), that Court held that "to convict a criminal defendant where prior crimes have been introduced to impeach his credibility as a witness violates the accused's constitutional right to testify in his own defense." It explained, at p. 660:

> "A number of authorities have come to believe that when the witness to be impeached is also the defendant in a criminal case, the introduction of prior convictions on the issue of whether the defendant's testimony is credible creates a substantial danger that the jury will conclude from the prior convictions that the defendant is likely to have committed the crime charged. The danger of prejudice is scarcely mitigated by an instruction to consider the prior convictions only in determining whether or not the defendant's testimony is credible. To inform the jury in a rape case that the defendant has a prior rape conviction and then instruct them to consider the conviction only in evaluating the defendant's credibility is to recommend 'a mental gymnastic which is beyond, not only their power, but anybody else.' " [Footnotes omitted.]

To date, insofar as we can tell, no other State has followed the rather broad Constitutional approach taken in *Santiago. See, for example, People v. Downs,* 206 N.W.2d 241 (Mich. App. 1973); *State v. Hackett,* 200 N.W.2d 493 (Iowa 1972); *State v. Prather,* 290 So. 2d 840 (La. 1974); *People v. McKenna,* 585 P. 2d 275 (Colo. 1978). This Court, relying heavily on *Spencer v. Texas, supra,* rejected a variety of Constitutional challenges to the impeachment rule in Nance v. State, 7 Md. App. 433 (1969), *cert. den.,*

256 Md. 747 (1970), *cert. den.,* 398 U. S. 954 (1970). The intermediate appellate court of Arizona, following the rationale expressed by the Hawaii Court, challenged the rule permitting cross-examination of criminal defendants as to prior convictions, *State v. Mayes,* 515 P. 2d 1185 (Ariz. App. 1973); however, the State's highest court declined to depart from the general rule. *State v. Mayes,* 518 P. 2d 568 (Ariz. 1974). Studies cited by the intermediate court showing that "jurors do not segregate evidence introduced for impeachment purposes" and that they "have an almost universal inability and/or unwillingness either to understand or to follow the court's instructions on the use of a defendant's prior criminal record for impeachment purposes" (515 P. 2d at 1187) were not considered as "persuasive authority to cause us to change our position" by the Arizona Supreme Court (518 P. 2d at 569). *Compare Spencer v. Texas, supra,* 385 U. S. at 565, n. 8.

For some of the non-judicial comment developing in this area, see notes, comments, and articles in 46 Temp. L.Q. 291 (1973); 20 Kansas L. Rev. 411 (1972); 25 Vand. L. Rev. 918 (1972); 6 Crim. Law Bull. 26 (1970); 1 Loy. Chi. L.J. 247 (1970); 71 W. Va. L. Rev. 160 (1969); 18 DePaul L. Rev. 1 (1968); 19 Hastings L.J. 919 (1968); 37 U. Cin. L. Rev. 168 (1968); 113 U. Pa. L. Rev. 382 (1965); 78 Harv. L. Rev. 426, 440-42 (1964); 22 Md. L. Rev. 244 (1962); 70 Yale L. J. 763 (1961); 36 Minn. L. Rev. 724 (1952); 89 Pa. L. Rev. 166 (1940); C. McCormick, Evidence, § 43 (1972).